[No. 39672. En Banc. May 22, 1969.]

HILLSIDE COMMUNITY CHURCH, INC., *Respondent,* v. THE CITY OF TACOMA *et al., Appellants.*\*

\*Reported in 455 P.2d 350.

*Marshall McCormick* and *Robert R. Hamilton,* for appellants.

*Donald J. Horowitz* (of *Farris, Bangs & Horowitz*) and *Allan L. Overland,* for respondent.

HUNTER, C. J.—This is an appeal by the city of Tacoma, and David D. Rowlands as Tacoma city manager, from a judgment of the Pierce County Superior Court requiring specific performance of a contract made and entered into between the plaintiff, Hillside Community Church, Inc., and the defendant, Washington Transit Advertising Company, acting as agent for the defendant, city of Tacoma.

On August 2, 1965, a committee from the Hillside Community Church contracted with the city of Tacoma, by and through its agent, the Washington Transit Advertising Company, for the display of 20 exterior display signs upon Tacoma transit buses. These signs bore copy relating to ending the war in Vietnam.

The signs in question read: "End war in Vietnam . . . Now! by peaceful negotiations. Urge use of resources for peace." The signs included print indicating that the Peace Committee of the Hillside Community Church was the sponsoring organization.

The signs were actually installed on the buses on or about August 5, 1965, but were ordered removed therefrom on or about August 9, by the defendant David Rowlands, acting as Tacoma city manager. The defendants have refused to allow the signs to be redisplayed on the buses, and the plaintiff began legal action to enforce the contract.

The city's actions were based upon the following provision in their contract with the Washington Transit Advertising Company, whereby the latter was entitled to sell advertising space on Tacoma transit buses: "Any advertisement objectionable to the City shall, upon written request of the City acting through its duly authorized representatives, be promptly removed by the advertising company."

The contract entered into by the defendant Washington Transit Advertising Company and the plaintiff contained, among other things, the following provision: "The form, wording and illustrations of cards shall not be of a kind or character objectionable to the transit companies in whose equipment cards are to be displayed."

The trial court held that the refusal of the defendants to permit the display of said signs constituted an unconstitutional abridgment of the plaintiff's right to free expression protected by the first and fourteenth amendments to the constitution of the United States, as well as the constitution of the state of Washington, and a denial to the plaintiff of equal protection of the laws guaranteed by the fourteenth amendment to the constitution of the United States, as well as the constitution of the state of Washington. The trial court, therefore, entered a judgment enjoining the defendants from interfering with the performance of the contract, and ordering specific performance of said contract. The city of Tacoma and its city manager, David D. Rowlands, appeal.

The defendants contend that the trial court erred in holding that their actions in removing the signs from the buses constituted a violation of the plaintiff's state and federal constitutional rights. The defendants argue that Tacoma operates its transit system in a proprietary or private capacity, as opposed to a governmental capacity. As such, they argue that they are subject to the same burdens, responsibilities and liabilities as a private corporation or individual acting in the same capacity and, therefore, have the sole and absolute discretion to publish or refuse to publish particular advertisements.

■ The general rule of the law is that a state or municipality cannot avoid the constitutional limitations upon state action by claiming the shield afforded proprietary functions. *Trenton v. New Jersey,* 262 U.S. 182, 67 L. Ed. 937, 43 S. Ct. 534, 29 A.L.R. 1471 (1923); *St. Petersburg v. Alsup,* 238 F.2d 830 (5th Cir. 1956), *cert. denied* 353 U.S. 922 (1957). In the latter case, involving an abuse of civil rights whereby

Negroes were denied the right to use a municipal beach and swimming pool, the court said:

A state cannot, by judicial decision or otherwise, remove any of its activities from the inhibitions of the Fourteenth Amendment. See Nixon v. Condon, 286 U.S. 73, 88, 52 S.Ct. 484, 76 L.Ed. 984. It is doubtful whether a municipality may ever engage in purely private action that would not be action of the state. See In re Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835; Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149.

In *Trenton v. New Jersey, supra,* the United States Supreme Court stated at 187:

A municipality is merely a department of the State, and the State may withhold, grant or withdraw powers and privileges as it sees fit. However great or small its sphere of action, it remains the creature of the State exercising and holding powers and privileges subject to the sovereign will. See *Barnes v. District of Columbia,* 91 U.S. 540, 544, 545.

The United States Supreme Court, speaking in *Cooper v. Aaron,* 358 U.S. 1, 17, 3 L. Ed. 2d 5, 78 S. Ct. 1401 (1958), also asserted:

" . . . The constitutional provision [of the Fourteenth Amendment], therefore, must mean that no agency of the State, or of the officers or agents by whom its powers are exerted, shall deny to any person within its jurisdiction the equal protection of the laws. Whoever, by virtue of public position under a State government, . . . denies or takes away the equal protection of the laws, violates the constitutional inhibition; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State. This must be so, or the constitutional prohibition has no meaning." *Ex parte Virginia,* 100 U.S. 339, 347. Thus the prohibitions of the Fourteenth Amendment extend to all action of the State denying equal protection of the laws; whatever the agency of the State taking the action, . . .

(Citations omitted.)

We therefore hold that the defendant city of Tacoma, although acting in a proprietary capacity when accepting advertising for its transit system, is within the ambit of

constitutional guarantees and is thereby bound by said guarantees.

The defendants further contend, however, that there is no overriding constitutional right or privilege compelling the defendants to accept the advertising in question. The defendants argue that they have never accepted advertisements of an abstract political nature nor have they thwarted any attempt of the plaintiff to advertise by conventional means.

██ The general rule of law in this respect is that while a state is under no duty to make its public facilities available for private purposes, if it elects to do so, it must make them available on a nondiscriminatory basis and with due regard to the constitutional right of freedom of expression. *East Meadow Community Concerts Ass'n v. Board of Education of Union Free School Dist. 3,* 18 N.Y.2d 129, 219 N.E. 2d 172 (1966); *Danskin v. San Diego Unified School Dist.,* 28 Cal. 2d 536, 171 P.2d 885 (1946). In the latter case the court held at 545:

> The state is under no duty to make school buildings available for public meetings. (See 86 A.L.R. 1195, 47 Am. Jur. 344.) If it elects to do so, however, it cannot arbitrarily prevent any members of the public from holding such meetings. (*Missouri ex rel. Gaines v. Canada,* 305 U.S. 337, 349 [59 S.Ct. 232, 83 L.Ed. 208]; see *Marsh v. Alabama,* 326 U.S. 501 [66 S.Ct. 276, 280, 90 L.Ed. ——].)

In a case very similar to the instant case, which involves anti-war posters on publicly owned buses in California, the Supreme Court of California, in *Wirta v. Alameda-Contra Costa Transit Dist.,* 68 Cal. 2d 51, 55, 64 Cal. Rptr. 430, 433, 434 P.2d 982 (1967) held:

> Our problem, therefore, is reduced to a situation in which a governmental agency has refused to accept an advertisement expressing ideas admittedly protected by the First Amendment for display in a forum which the agency has deemed suitable for the expression of ideas through the medium of paid advertisements. This refusal is based on the ground that the agency's policy is to accept only advertisements for the sale of goods or services and certain types of political advertising at limited times. We conclude that defendants, having opened

·a forum for the expression of ideas by providing facilities for advertisements on its buses, cannot for reasons of administrative convenience decline to accept advertisements expressing opinions and beliefs within the ambit of First Amendment protection.

As the court in *Wirta* asserted at 56:

The vice is not that the district has preferred one point of view over another, but that it chooses between classes of ideas entitled to constitutional protection, sanctioning the expression of only those selected, and banning all others. Thus the district's regulation exercises a most pervasive form of censorship.

Not only does the district's policy prefer certain classes of protected ideas over others but it goes even further and affords total freedom of the forum to mercantile messages while banning the vast majority of opinions and beliefs extant which enjoy First Amendment protection because of their noncommercialism. No statistical data is required to demonstrate that in the totality of man's communicable knowledge, that which bears no relationship to material value preponderates.

That court at 56 also quoted its earlier decision in *Danskin v. San Diego Unified School Dist., supra,* that "It is not for the state to control the influence of a public forum by censoring the ideas, the proponents, or the audience. . . ."

The United States Supreme Court has been both clear and firm in its protection of the right of the individual to freedom of speech. As stated in *Terminiello v. Chicago,* 337 U.S. 1, 4-5, 93 L. Ed. 1131, 69 S. Ct. 894 (1949):

[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute . . . is nevertheless protected against censorship or punishment, *unless shown likely to produce a clear and present danger* of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest . . . There is no room under our

Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups.

(Italics ours.) See, *Thomas v. Collins,* 323 U.S. 516, 89 L.Ed. 430, 65 S. Ct. 315 (1945); *Schenck v. United States,* 249 U.S. 47, 63 L. Ed. 470, 39 S. Ct. 247 (1919); see also, *Schneider v. State,* 308 U.S. 147, 84 L. Ed. 155, 60 S. Ct. 146 (1939); *Cox v. Louisiana,* 379 U.S. 536, 13 L. Ed. 2d 471, 85 S. Ct. 453 (1965). Once a municipality or public body enters the field of advertising, therefore, the law requires that a showing of a "clear and present" danger must be made in order to limit such advertising without conflicting with guarantee of freedom of speech under the First and Fourteenth Amendments. See, citations above; *Wirta v. Alameda-Contra Costa Transit Dist., supra; Kissinger v. New York City Transit Authority,* 274 F. Supp. 438 (S.D. N.Y. 1967).

In *Kissinger,* the court disposed of issues virtually identical to the ones posed in this appeal. The defendants to that action also argued that there was no violation of constitutional rights because they had limited the advertising they would accept to (a) commercial advertising for the sale of goods, etc., (b) public service announcements; and (c) political advertising at the time of and in connection with elections. However, the court did not agree with this contention and held only a showing of a clear and present danger would justify the refusal. The court stated at 442:

> Absent a showing that the posters would present a "clear and present" danger (see, e. g., Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919)), the guarantee of freedom of speech under the First and Fourteenth Amendments extends to plaintiffs' posters (see, e. g., Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Schneider v. State of New Jersey, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939)), and although it may be that the Authority and the Advertising Company could refuse to accept all posters for display in the subways . . . [citations omitted], the Authority and the Advertising Company cannot accept some posters and refuse the plaintiffs' for reasons

that conflict with the First Amendment guarantee of the right to freedom of speech.

(Citations omitted.)

The action against the city of Tacoma, in the instant case, is much stronger than that which existed against the New York City Transit Authority in the *Kissinger* case. The New York posters, which also opposed the war in Vietnam, carried the picture of a child burned by napalm bombs and were politically much more controversial than those used in Tacoma. Moreover, in Tacoma the contract was entered into and acted upon, whereas in New York, the plaintiffs sought a declaratory judgment requiring the defendants to accept the posters for display. Although that court denied the plaintiffs' motion for a summary judgment, it did so because issues of clear and present danger were raised which the court held could be resolved only at trial.

We find the reasoning of the *Kissinger* and *Wirta* cases to be sound and applicable to the present case. There being an absence of any substantial showing in this record of a clear and present danger caused by the display of the posters, we hold that the defendants' actions were unconstitutional. We find that the said actions, which were based upon the contract provision authorizing the defendants to reject "objectionable material," were clearly acts of censorship. This was a violation of the plaintiff's right to free expression as guaranteed by the first and fourteenth amendments to the constitution of the United States, as well as the constitution of the state of Washington, and denied the plaintiff the equal protection of the laws as guaranteed by the fourteenth amendment to the constitution of the United States, and the constitution of the state of Washington.

The judgment of the trial court is affirmed.

HILL, WEAVER, ROSELLINI, HALE, and McGOVERN, JJ., concur.

FINLEY, J. (concurring in the result)—I concur in the result of the majority opinion by Hunter, C. J. As that opinion states, the city of Tacoma has made no showing

which would justify a restriction upon the speech forum involved—advertising displayed upon city transit buses. The evidence presented by the city fell short of meeting common understanding of the clear and present danger test. More particularly, the proof falls short of what I consider to be a more refined and preferable application of the clear and present danger test. *No convincing showing has been made as to reasonably foreseeable harm to, interference with, or disruption of Tacoma's public transportation system.* Cf. *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 21 L. Ed. 2d 731, 89 S. Ct. 733 (1969).

Before further discussion regarding the application of the clear and present danger test to the instant factual situation, certain aspects of the city's attempt at contractual regulation of the advertising should be evaluated. The sole regulatory criterion was that advertising "objectionable to the city" could be rejected. The purported criterion is completely lacking in objective content, and renders official review of material submitted for display upon the buses utterly subjective. While such a criterion may be enforceable as to material unprotected by the First Amendment, such a criterion fails for vagueness in the face of the values embodied in and protected by the First Amendment. *E.g., Interstate Circuit, Inc. v. Dallas,* 390 U.S. 676, 20 L. Ed. 2d 225, 88 S. Ct. 1298 (1968).

Even if the standard chosen could survive a vagueness attack on its face, it would fall for its commitment of unfettered discretion into the hands of the enforcing official. *Cox. v. Louisiana,* 379 U.S. 536, 557-58, 13 L. Ed. 2d 471, 85 S. Ct. 453 (1965); *Niemotko v. Maryland,* 340 U.S. 268, 95 L. Ed. 267, 71 S. Ct. 325 (1951).

The criterion additionally fails on its face for overbreadth. Narrowly drawn and properly promulgated standards could exclude from the buses that advertising which the city has a substantial police power interest in controlling and which it has constitutional power to control. The exercise of First Amendment rights may not be interfered with or restricted except for the protection of valid inter-

ests which cannot be protected by alternative means. *In re Hoffman,* 67 Cal. 2d 845, 434 P.2d 353 (1967) (Traynor, C.J.); *Elfbrandt v. Russell,* 384 U.S. 11, 16 L. Ed. 2d 321, 86 S. Ct. 1238 (1966) (freedom of association); *Shelton v. Tucker,* 364 U.S. 479, 5 L. Ed. 2d 231, 81 S. Ct. 247 (1960) (freedom of association).

There is no need for further discussion of the infirmities inherent in Tacoma's attempted regulatory action. As indicated by the majority, that action appears to have resulted from some misconception regarding archaic distinctions between so-called proprietary and governmental functions, and from reliance on that misconception as conferring upon the city's action some sort of immunity from the state and federal constitutions. The majority opinion sufficiently demonstrates the error in thinking into which the city seems to have fallen.

It is desirable, however, that the city's gross miscalculation of its power should not be occasion for misleading and ill-measured statements by this court. For that reason, I believe it necessary to elaborate on the reasoning of the majority.

It is obvious that the primary public function of the city transit operation is public transportation. The speech which may take place in conjunction with this primary function is something of a happenstance. However, it is clear that a forum function which does not interfere with the primary purpose of a facility open to the public may not be interfered with except in protection of valid interests which cannot be protected by alternative means. *In re Hoffman, supra.*

It is therefore necessary to ask, as to each of the precedents relied on by the majority, upon what circumstance the deciding court relied in finding that a forum was in existence, and what interest the deciding court evaluated in considering whether or not the advertising could be barred.

*Wirta v. Alameda-Contra Costa Transit Dist.,* 68 Cal. 2d 51, 64 Cal. Rptr. 430, 434 P.2d 982 (1967) relies upon an a fortiori argument that permitting the display of commer-

cial advertising has the effect of opening a well nigh limitless forum. I find the argument most unconvincing.[1] However, on facts which are essentially those of the instant case, *Kissinger v. New York City Transit Authority,* 274 F. Supp. 438 (S.D. N.Y. 1967), held that a forum was in existence. I do not challenge the majority's conclusion in the instant case that a forum did exist.

A forum cannot exist unless the speech activity in question can be carried on without substantial interference with the primary function of the asserted forum. *In re Hoffman, supra; Brown v. Louisiana,* 383 U.S. 131, 15 L. Ed. 2d 637, 86 S. Ct. 719 (1966). *Compare Adderley v. Florida,* 385 U.S. 39, 17 L. Ed. 2d 149, 87 S. Ct. 242 (1966) *with Brown. See generally* Kalven, *The Concept of the Public Forum,* 1965 Supreme Ct. Rev. 1, 12-22, 29-32.

It is unclear whether the determination that substantial interference with the asserted forum's primary purpose will result is entirely a judicial question. *Compare Tinker v. Des Moines Independent Community School Dist., supra, with Public Util. Comm'n v. Pollak,* 343 U.S. 451, 96 L. Ed. 1068, 72 S. Ct. 813 (1952). It is unnecessary to face that question in the instant case.

*Wirta* and *Kissinger* defer to an initial administrative judgment to allow advertising. *Pollak* carefully deferred to administrative findings, but the court with equal care refused to find that free speech issues had been raised. In *Tinker,* faced with those issues in a school classroom, the

---

[1]The argument is unconvincing for two reasons.

The a fortiori form assumes that the interests involved in commercial expression and first amendment speech are the same and hence that to allow the former means the latter must be allowed. But the transit system may have allowed the former because the messages which it conveys *are* unimportant, *do not reach* fundamental values, and *do not deeply arouse* emotional responses. It may be tolerable precisely because it is trivial.

The use in the argument of the concurring opinion from *Cox v. Louisiana, supra,* weakens it severely. Justice Black's view of the statute in *Cox* as void on its face is not shared by the rest of the court, which stopped short of that decision. Moreover, even if the Black view is correct, it is applicable here only if commercial advertising is protected speech. This is not the law. *See* note 3, *infra.*

court gave no credence to arguments that the wearing of armbands was disruptive of the educational process, the administrative guardianship of which was committed to the school board.[2]

Absent a clear United States Supreme Court holding to the contrary, I believe that it was within the city's power in this case to close the forum by officially binding itself to the rejection of all noncommercial bus advertising.[3] Tacoma took no such action.

Since a forum was in existence, the question which has, in my opinion, been misleadingly answered by the majority is: What showing is required to close the forum to expression of a specific idea or appeal? The majority opinion states: "There being an absence of any substantial showing of clear and present danger caused by the display of the posters, we hold that the defendants' actions were unconstitutional."

The circumstances that a First Amendment defense is often asserted in response to charges of disorderly conduct, incitement to riot, or violation of anti-subversion laws has produced an unfortunate result. "Clear and present danger" is of itself meaningless. Danger requires that something or someone be imperiled. The term has, through the circumstance to which I refer, acquired a connotation of danger of riot, disorder, or organized subversion. This connotation is utterly absent from Mr. Justice Holmes dictum in *Schenck v. United States*, 249 U.S. 47, 52, 63 L. Ed. 470, 39 S. Ct. 247 (1919):

> The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger *that they will bring about the substantive evils that Congress has a right to prevent.*

(Italics mine.)

---

[2]See the vigorous dissent per Black, J., as to the unsuitability of schools as a forum for student protest, and the deference owed to the school administrators' decision.

[3]Commercial advertising is subject to an entirely different regulatory test. *Valentine v. Chrestensen*, 316 U.S. 52, 86 L. Ed. 1262, 62 S. Ct. 920 (1942) *and see Breard v. Alexandria*, 341 U.S. 622, 95 L. Ed. 1233, 71 S. Ct. 920 (1951).

The majority, quoting *Kissinger,* 274 F. Supp. at 442, has thereby glossed *Schenck* with *Cantwell v. Connecticut,* 310 U.S. 296, 84 L. Ed. 1213, 60 S. Ct. 900, 128 A.L.R. 1352 (1940). The *Kissinger* opinion quotes *Cantwell* as follows:

"When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious.

(*quoting Cantwell,* 310 U.S. at 308.) When it is recalled that Cantwell, a Jehovah's Witness, was charged with breach of the peace for playing recordings of a vitriolic attack on Roman Catholicism to persons accosted on the street in a Catholic neighborhood in New Haven, the aptness of the language quoted *as applied to Cantwell* is at once apparent.

Similarly, the majority quotes from *Terminiello v. Chicago,* 337 U.S. 1, 4, 93 L. Ed. 1131, 69 S. Ct. 894 (1949), a passage containing the phrase *"unless shown likely to produce a clear and present danger* of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest . . ." (Italics added by majority.) That was the showing required to convict Father Terminiello.[4] If such a showing were not required, police could respond to an attack upon a peaceful but unpopular meeting by arresting the speaker instead of the attackers.

The majority opinion has cited the cases analyzed above and relied upon the quoted language in an inapposite manner. "Clear and present danger" cannot be discussed without discussion of the substantive evil whose danger threatens. That evil must be something which there is legislative power to prevent.

Having discussed the circumstances which call a forum

[4]Terminiello was convicted of breach of the peace under an instruction allowing conviction for behavior which "stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance." 337 U.S. at 3. Because of the general verdict, the instruction was read into the ordinance, and Terminiello's conduct was reviewed on the instruction, not the facts. On that reading of the record, Terminiello was convicted for a relatively peaceful speech to a sympathetic audience, which was disrupted by mob violence. The actual facts which provoked the prosecution are detailed in Mr. Justice Jackson's vigorous dissent.

into existence, and the manner in which the majority applied the clear and present danger test in that forum, I must return to the second portion of what I believe a pertinent and necessary analysis should include in this case. The interest which the court evaluated in deciding if particular advertising could be barred must be isolated. *Kissinger,* at 442, recognizes that the advertising must be displayed "unless the posters present a *serious and immediate threat to the safe and efficient operation of the subways.*" (Italics mine.) The evil whose danger may be protected against is not insurrection but interference with the transportation system. *Wirta v. Alameda-Constra Costa Transit Dist.,* 68 Cal. 2d 51, 60, 64 Cal. Rptr. 430, 434 P.2d 982, 988 (1967), simply paraphrases Holmes—"clear and present danger that a serious substantive evil will result . . ."

It appears to me that for the purposes of the instant case the substantive evil against which the law may protect is interference with the transportation system; for if interference with the transportation system occurs, the system has been diverted from its primary function, and the forum, by definition, disappears. *In re Hoffman, supra; Kissinger v. New York City Transit Authority, supra. Accord: Tinker v. Des Moines Independent Community School Dist., supra.*

For the above reasons, I believe that the showing required of the city is simply convincing proof that reasonably foreseeable harm to, disruption of, or interference with the public transportation system would result from display of the challenged advertising.

A brief examination of the record is now in order. The trial court specifically refused to enter an offered finding of fact stating that the city officials became concerned as to incidents threatening the lives and safety of the citizens of the city and as to damage to both city and private property after various city officials had received letters, telephone calls, and complaints about the signs.

The trial court did find:

The signs in question, as worded and printed and as displayed, did not in themselves, nor did the word content

thereof, pose a clear and present danger to the government or the welfare of the society *in any fashion or means whatsoever,* nor was it or is it in any way detrimental to the welfare of the community from the viewpoint of a clear and present danger.

(Italics mine.)

It is clear from the above findings that the trial court refused to believe the city's arguments as to the weight which the vague complaints mentioned should be given in forecasting interference with the buses or the probability of disorderly demonstrations.

My disagreement with the majority opinion arises from a belief that it may be read as approving the display of messages designed to inflame racial or political passion or tensions in the face of a showing that a disruption of transit operations by interference with either buses or their passengers could be reasonably foreseen. That is not, and never has been, the law. The city is not required to sacrifice essential public services to a quixotic pursuit of pandemonium. *Cf. Adderley v. Florida, supra.* The city is required to make a proper showing before barring innocuous posters from its buses. In its adverse reaction to the facts of the instant case, this court ought not decide it in such a manner that public officials are misinstructed as to their duties, responsibilities, and official discretion.

For the reasons given, I concur in the result of the majority opinion.

HAMILTON and NEILL, JJ., concur with FINLEY, J.