11 F.3d 170
 304 U.S.App.D.C. 126, 21 Media L. Rep. 2289
 ACTION FOR CHILDREN'S TELEVISION; American Civil Liberties
Union; The Association of Independent Television Stations,
Inc.; Capital Cities/ABC, Inc.; CBS Inc.; Fox Television
Stations, Inc.; Greater Media, Inc.; Infinity Broadcasting
Corporation; Motion Picture Association of America, Inc.;
National Association of Broadcasters; National Public
Radio; People for the American Way; Post-Newsweek
Stations, Inc.; Public Broadcasting Service;
Radio-Television News Directors Association; Reporters
Committee for Freedom of the Press; Society of Professional
Journalists, Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents,
Morality in Media; National Family Legal Foundation;
American Family Association; Focus on the Family; National
Law Center for Children and Families; Concerned Women of
America; National Coalition Against Pornography; National
Association of Evangelicals; Religious Alliance Against
Pornography; Family Research Council; National Religious
Broadcasters, Amici Curiae.
PACIFICA FOUNDATION; National Federation of Community
Broadcasters; American Public Radio; National Association
of College Broadcasters; Intercollegiate Broadcast System;
Pen American Center; Allen Ginsberg, Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION; United States of
America, Respondents.
 Nos. 93-1092, 93-1100.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 13, 1993.
Decided Nov. 23, 1993.
Rehearing Denied; Rehearing In Banc Granted, Judgment
Vacated Feb. 16, 1994.
 
 [304 U.S.App.D.C. 127] Petition for Review of an Order of the Federal Communications Commission.
 Timothy B. Dyk, argued the cause for petitioners Action for Children's Television, et al., in No. 93-1092. With him on the joint brief were Barbara McDowell, Marjorie Heins, James J. Popham, Molly Pauker, Steven A. Lerman, Dennis P. Corbett, Laura B. Humphries, John P. Crigler, Elliot M. Mincberg, Henry L. Baumann, Steven A. Bookshester, Theodore A. Miles, Karen Christensen, Eric M. Lieberman, Thomas C. Viles, Andrew J. Schwartzman, Jonathan D. Blake, Paula A. Jameson, Nancy H. Hendry, J. Laurent Scharff, Jane E. Kirtley, Bruce W. Sanford and Henry S. Hoberman. Steven R. Shapiro entered an appearance for petitioner American Civil Liberties Union in No. 93-1092. Martin Wald entered an appearance for petitioner Post-Newsweek Stations, Inc., in No. 93-1092.
 Eric M. Lieberman argued the cause for petitioners Pacifica Foundation, et al., in No. 93-1100. With him on the brief was John P. Crigler. Thomas C. Viles entered an appearance for petitioners in No. 93-1100.
 Jane E. Mago, Asst. Gen. Counsel, F.C.C., argued the cause for respondents. With her on the brief were Renee Licht, Acting Gen. Counsel, Daniel McMullen Armstrong, Asst. Gen. Counsel, Clifford G. Pash, Jr., and Peter A. Tenhula, Counsel, F.C.C., and Barbara L. Herwig and Jacob M. Lewis, Attys., U.S. Dept. of Justice.
 On the joint brief for amici curiae were George R. Grange, James P. Mueller and Paul J. McGeady.
 Before MIKVA, Chief Judge, WALD and EDWARDS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WALD.
 Opinion concurring specially filed by Circuit Judge HARRY T. EDWARDS.
 WALD, Circuit Judge:
 
 
 1
 Petitioners, a group of broadcasters, authors, program suppliers, listeners, and viewers challenge the constitutionality of a Federal Communications Commission ("FCC" or "Commission") order, issued at the direction of Congress, banning "indecent" material from broadcasting during the hours from 6 a.m. to midnight.[1] While we break some new ground, our decision that the ban violates the First Amendment relies principally upon two prior decisions of this court in which we addressed similar challenges to FCC orders restricting the broadcasting of "indecent" material, as defined by the FCC. See Action for Children's Television v. FCC, 852 F.2d 1332 (D.C.Cir.1988) ("ACT I "), Action for Children's Television v. FCC, 932 F.2d 1504 (D.C.Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1281, 117 L.Ed.2d 507 (1992) ("ACT II ").
 
 
 2
 The FCC invokes three goals to justify the regulations: (i) "ensuring that parents have an opportunity to supervise their children's listening and viewing of over-the-air broadcasts," (ii) "ensuring the well being of minors" regardless of parental supervision, and (iii) protecting "the right of all members of the public to be free of indecent material in the privacy of their homes." In re Enforcement of Prohibitions Against Broadcast Indecency in 18 U.S.C. Sec. 1464, 8 F.C.C.R. 704, 705-706 pp 10, 14 (1993) ("1993 Order"). See Respondents' Brief at 14. For reasons stated below, we find the third interest, protecting the general public, insufficient to support a restriction on the broadcasting of constitutionally protected "indecent" material; we accept as compelling the first two interests involving the welfare of children, but in our view, the FCC and Congress have failed to tailor their efforts to advance these interests in a sufficiently narrow way to meet constitutional standards.
 
 I. BACKGROUND
 
 3
 Since the Radio Act of 1927, federal law has prohibited the broadcasting of "indecent" material. 18 U.S.C. Sec. 1464.[2] See Radio Act [304 U.S.App.D.C. 128] of 1927, Pub.L. No. 69-632, Sec. 29, 44 Stat. 1162, 1172-73; FCC v. Pacifica Found., 438 U.S. 726, 735-38, 98 S.Ct. 3026, 3033-35, 57 L.Ed.2d 1073 (1978) ("Pacifica") (discussing statutory history of indecency regulation).[3] The Commission interpreted the "concept of 'indecent' [to be] intimately connected with the exposure of children to language that describes, in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities and organs, at times of the day when there is a reasonable risk that children may be in the audience." Pacifica Found., 56 F.C.C.2d 94, 98 (1975), quoted in Pacifica, 438 U.S. at 731-32, 98 S.Ct. at 3031.
 
 
 4
 In 1978, the Supreme Court upheld an FCC decision finding "indecent" a monologue by entertainer George Carlin entitled "Filthy Words" broadcast over radio at 2 o'clock in the afternoon. Pacifica, 438 U.S. at 734-35, 750-51, 98 S.Ct. at 3033, 3041. For the next decade the Commission limited itself to enforcing the Sec. 1464 indecency ban only against material involving "the repeated use, for shock value, of words similar or identical to those satirized in the Carlin 'Filthy Words' monologue." In re Infinity Broadcasting Corp. of Pa., 3 F.C.C.R. 930 p 4 (1987) ("Reconsideration Order"). In addition, the Commission took no action against broadcasters who broadcast indecent but not obscene material after 10 p.m. Id.
 
 
 5
 In 1987 the Commission broadened its enforcement of Sec. 1464 by issuing a ruling which affirmed, on reconsideration, three prior rulings against broadcasters for airing indecent material. Reconsideration Order, 3 F.C.C.R. 930.[4] First, the Commission narrowed the safe harbor period for "indecent" material to the hours between midnight and 6 a.m.; second, it broadened its enforcement of Sec. 1464 to include all material encompassed by its description of "indecency" rather than only the "Filthy Words" category. The Commission also abandoned reliance on the time of broadcast as an element of the determination of whether material was "indecent." It now considered broadcast time only as a factor in the decision of whether to take action against "indecent" broadcasting. See ACT I, 852 F.2d at 1338 n. 8. Today, the FCC "defines broadcast indecency as language or material that, in context, depicts or describes, in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities or organs." 1993 Order, 8 F.C.C.R. at 704-5 p 4 n. 10. This does not appear materially different from the definition considered in ACT I.
 
 
 6
 The Reconsideration Order was the subject matter of ACT I, which upheld the indecency standard promulgated by the FCC against vagueness and overbreadth challenges in light of the Commission's "avowed objective ... not to establish itself as a censor but to assist parents in controlling the material young children will hear." 852 F.2d at 1334 (emphasis in original). See also id. at 1343. However, ACT I struck down the contraction of the safe harbor period to midnight through 6 a.m. as unjustified by the record. Id. at 1334. In particular, the ACT I court noted that the Commission had not explained its expansion of the definition of protected "children" from below-12 years of age to adolescents from 12-17, and moreover, had merely estimated "the number of teens in the total ... audience," and not adduced any specific audience data for the "specific ... stations" that were alleged to have placed children at risk of exposure to indecent material. Id. at 1341 (emphasis in original). See id. at 1341-44.
 
 
 7
 Following ACT I, Congress passed an appropriations rider which directed the FCC to promulgate regulations for the enforcement of Sec. 1464 on a 24-hour per day basis. [304 U.S.App.D.C. 129] Pub.L. No. 100-459, Sec. 608, 102 Stat. 2186, 2228 (1988). The FCC conducted rulemaking proceedings in support of the 24 hour ban in 1989-90. See In re Enforcement of Prohibitions Against Broadcast Indecency in 18 U.S.C. Sec. 1464, 4 F.C.C.R. 8358 (1989) (notice of inquiry) ("1989 NOI"); 5 F.C.C.R. 5297 (1990) ("1990 Report"). This court in ACT II struck down the 24-hour prohibition on broadcasting of indecent material. 932 F.2d at 1510. The court relied largely on its interpretation of ACT I as requiring that some safe harbor for broadcasting indecent material be maintained, and that even "Congress itself" could not totally ban indecent speech. Id. at 1509. Since the decision in ACT II "effectively return[ed] the Commission to the position it briefly occupied after ACT I and prior to congressional adoption of" the 24-hour ban, we directed the Commission to resume its rulemaking to determine the factual issues as mandated by ACT I: "among them, the appropriate definitions of 'children' and 'reasonable risk' [of exposure to indecent material] for channeling purposes, the paucity of station- or program-specific audience data expressed as a percentage of the relevant age group population, and the scope of the government's interest in regulating indecent broadcasts." ACT II, 932 F.2d at 1510 (citing ACT I, 852 F.2d at 1341-44).
 
 
 8
 Before the Commission could initiate hearings after ACT II, Congress intervened once again, passing the Public Telecommunications Act of 1992, Pub.L. No. 102-356, 106 Stat. 949 ("Telecommunications Act"), which in section 16(a) required the Commission to promulgate a new rule barring indecent material during the broadcast hours from 6 a.m. to midnight, but allowing public broadcast stations that go off the air at or before midnight an additional two hours (between 10 p.m. and midnight) during which they may broadcast "indecent" material. Id. at Sec. 16(a), 106 Stat. at 954. Since "Congress ha[d] balanced the competing interests affected by the regulation of broadcast indecency and ha[d] determined that a 12 midnight-to-6 a.m. safe harbor properly effectuates those interests[, t]he focus of th[e ensuing rulemaking] proceeding [was] ... confined to the matter of updating the Commission's record pertaining to the governmental interest in restricting the broadcasting of indecent material." In re Enforcement of Prohibitions Against Broadcast Indecency in 18 U.S.C. Sec. 1464, 7 F.C.C.R. 6464, 6465 p 9 (1992) (notice of proposed rulemaking) ("1992 NPRM") (footnote omitted).
 
 
 9
 The Commission subsequently released a Report and Order which articulated the government's interests as (i) "ensuring that parents have an opportunity to supervise their children's listening and viewing of over-the-air broadcasts," (ii) "ensuring the well being of minors" regardless of parental supervision, and (iii) protecting "the right of all members of the public to be free of indecent material in the privacy of their homes." 1993 Order, 8 F.C.C.R. at 705-06 pp 10, 14. The resulting regulations track section 16 of the Telecommunications Act, prohibiting public radio and television stations that go off the air on or before midnight from airing indecent material between 6 a.m. and 10 p.m., and prohibiting all other broadcast stations from airing indecent material between the hours of 6 a.m. and midnight. Id. at 711 (Appendix A) (to be codified at 47 C.F.R. Sec. 73.3999).
 
 
 10
 Petitioners seek review of these regulations, charging primarily that they are unconstitutional first, because they are not narrowly enough tailored to meet First Amendment standards, and second, because the exception they make for public broadcast stations that go off the air on or before midnight violates the equal protection of the laws. The Commission's 1993 Order has been stayed pending review. Action for Children's Television v. FCC, No. 93-1092 (D.C.Cir. Jul. 23, 1993) (order filed). Because we conclude that the basic 6 a.m.-to-midnight ban, despite compelling interests regarding the protection of children, is not sufficiently narrow to meet constitutional requirements, we do not reach petitioners' equal protection challenge to the additional 10 p.m.-to-midnight safe harbor granted only to public broadcast stations going off the air before midnight.[5]
 
 
 11
 [304 U.S.App.D.C. 130] To clear the channels for our subsequent discussion, we reiterate accepted doctrine that (i) indecent speech is protected by the First Amendment, see ACT II, 932 F.2d at 1509; ACT I, 852 F.2d at 1340, and (ii) the government may "regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest," Sable Communications of Cal., Inc. v. FCC, 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989). See Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y., 447 U.S. 530, 540, 100 S.Ct. 2326, 2334, 65 L.Ed.2d 319 (1980); ACT II, 932 F.2d at 1509; ACT I, 852 F.2d at 1343 n. 18.
 
 II. PROTECTION OF ADULTS
 
 12
 Relying mainly on FCC v. Pacifica Foundation, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), the government maintains that the 6 a.m.-to-midnight ban promotes its compelling interest in protecting the privacy of every American's home. See Respondents' Brief at 23, 1993 Order, 8 F.C.C.R. at 706 p 14. It argues that Pacifica acknowledges the " 'uniquely pervasive presence' " of broadcasting which invades residential privacy where " 'the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder.' " Respondents' Brief at 23 (quoting Pacifica, 438 U.S. at 748, 98 S.Ct. at 3039). This inherently intrusive nature of broadcasting, the government contends, permits it to ban indecent material from the airwaves during all but the hours when most people are asleep.
 
 
 13
 The Supreme Court in Pacifica held that the FCC had the authority to sanction a licensee who broadcast the indecent Carlin monologue at 2 o'clock in the afternoon. 438 U.S. at 735, 750-51, 98 S.Ct. at 3033, 3041. Pacifica was a quite narrow decision upholding only the ruling of the FCC sanctioning specific words in a specific context broadcast at a specific time of day. Id. at 750, 98 S.Ct. at 3041 ("It is appropriate ... to emphasize the narrowness of our holding."); id. at 755-56, 98 S.Ct. at 3043 (Powell, J., concurring).[6] The Court expressly cautioned that it was not endorsing the reasoning of the underlying FCC ruling,[7] but only its ultimate holding that the Carlin monologue on "Filthy Words" as broadcast at 2 p.m. violated the indecency ban of Sec. 1464. Id. at 734-35, 98 S.Ct. at 3033. Indeed, the Supreme Court's decision might well be read as limited to situations in which children must be protected from exposure to indecent material. Although an adult had been listening to the program with his son, id. at 730, 98 S.Ct. at 3030, the Court went out of its way to emphasize the limits of its ruling by cautioning that "whether broadcast audiences in the late evening contain so few children that playing this monologue would be permissible is an issue neither the Commission nor this Court has decided." Id. at 750 n. 28, 98 S.Ct. at 3041 n. 28. Therefore, despite recognition of the "relevance" of [304 U.S.App.D.C. 131] the privacy interest, id. at 748, 98 S.Ct. at 3039, Pacifica did not rest its holding on a general privacy rationale applicable to adults and children alike. See id. at 750, 98 S.Ct. at 3041 ("The ease with which children may obtain access to broadcast material, coupled with the concerns [relating to children] recognized in Ginsberg[ v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) ], amply justify special treatment of indecent broadcasting."); see also Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 74, 103 S.Ct. 2875, 2884, 77 L.Ed.2d 469 (1983) ("In ... Pacifica ... this Court did recognize that the Government's interest in protecting the young justified special treatment of an afternoon broadcast heard by adults as well as children." (footnote omitted)); New York v. Ferber, 458 U.S. 747, 757, 102 S.Ct. 3348, 3354, 73 L.Ed.2d 1113 (1982) ("[W]e held [in Pacifica ] that the Government's interest in the 'well-being of its youth' justified special treatment of indecent broadcasting received by adults as well as children." (citation omitted)).[8]
 
 
 14
 We too are reluctant to recognize any generalized government interest in protecting adults from indecent speech, primarily because the official suppression of constitutionally protected speech runs counter to the fundamental principle of the First Amendment "that debate on public issues should be uninhibited, robust, and wide-open." New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). Accord Hustler Magazine v. Falwell, 485 U.S. 46, 55-56, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988). While we recognize that in broadcasting the First Amendment primarily protects "the right of the viewers and listeners, not the right of the broadcasters," Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969) (citation omitted), we note that by the same token, the First Amendment protects the rights of all listeners and viewers--not just of that part of the audience whose listening and viewing habits meet with government approval. Therefore, " '[a]t least where obscenity is not involved, [the Supreme Court] ha[s] consistently held that the fact that protected speech may be offensive to some does not justify its suppression.' " Bolger, 463 U.S. at 71, 103 S.Ct. at 2883 (quoting Carey v. Population Servs. Int'l, 431 U.S. 678, 701, 97 S.Ct. 2010, 2024, 52 L.Ed.2d 675 (1977)).
 
 
 15
 Bolger, in striking down a complete ban on unsolicited mailings of contraceptive advertisements, noted that in order to permit the suppression of speech solely on the ground that it is offensive to some, the government must show that the audience is "captive" and cannot avoid the objectionable speech. Id. 463 U.S. at 72, 103 S.Ct. at 2883. See also Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y., 447 U.S. 530, 538-42, 100 S.Ct. 2326, 2333-35, 65 L.Ed.2d 319 (1980) (striking down subject-matter restriction on public utility's bill inserts where utility bill readers were not captive audience); Frisby v. Schultz, 487 U.S. 474, 484-87, 108 S.Ct. 2495, 2502-04, 101 L.Ed.2d 420 (1988) (upholding restriction on residential picketing because target of the focused picketing is a captive audience); Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (upholding selective grant of advertisement space in rapid transit cars where audience is captive). We refrain, however, from extending the captive audience rationale to the context of scheduled broadcast programming. Cf. Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm., [304 U.S.App.D.C. 132] 412 U.S. 94, 127-28, 93 S.Ct. 2080, 2099, 36 L.Ed.2d 772 (1973) (noting that broadcast audience is captive with respect to advertisements that interrupt scheduled programs).[9] Viewers and listeners of scheduled programs do retain options that the resident who is involuntarily picketed, or the commuter who must use public transportation in order to earn her livelihood does not. Viewers and listeners retain the option of using program guides to select with care the programs they wish to view or hear. Occasional exposure to offensive material in scheduled programming is of roughly the same order that confronts the reader browsing in a bookstore. And as a last resort, unlike residential picketing or public transportation advertising "the radio [and television] can be turned off." Packer Corp. v. Utah, 285 U.S. 105, 110, 52 S.Ct. 273, 275, 76 L.Ed. 643 (1932) (unanimous). See Lehman, 418 U.S. at 302, 94 S.Ct. at 2716 (plurality) (quoting same).
 
 
 16
 Even if we were to accord some measure of legitimacy to the government's interest in protecting the privacy of the home from unwelcome broadcast material, the government has undermined its own reliance on that interest, by arguing that " 'submission of market-wide data demonstrating that there is no appreciable child audience during the relevant time period would raise a viable defense to a charge of indecency outside of the safe harbor [time period].' " Respondents' Brief at 39 (quoting 1993 Order, 8 F.C.C.R. at 710 p 37, and citing 1990 Report, 5 F.C.C.R. at 5309 pp 89-90). Validation of this potential defense to a charge of indecent broadcasting reveals the government's true concern as the protection of children--not adults--from indecent broadcasting. Since the asserted interest in protecting adults falls completely out of the picture with the disappearance of children in the audience, we must assume that the purpose of the ban is to protect only the children.[10] We consequently reject reliance on a generalized privacy rationale to justify regulation of indecent broadcasting.
 
 III. PROTECTION OF CHILDREN
 
 17
 The Commission invokes two separate interests relating to children purportedly served by the 6 a.m.-to-midnight ban: (i) an interest in helping parents supervise their children, and (ii) an independent interest in shielding children from exposure to indecent [304 U.S.App.D.C. 133] material regardless of parental supervision. Recognizing that "even where there is an invasion of protected freedoms 'the power of the state to control the conduct of children reaches beyond the scope of its authority over adults,' " Ginsberg, 390 U.S. at 638, 88 S.Ct. at 1280 (footnote omitted) (quoting Prince v. Massachusetts, 321 U.S. 158, 170, 64 S.Ct. 438, 444, 88 L.Ed. 645 (1944)), we acknowledge the compelling nature of both government interests in protecting children. Nevertheless, despite those compelling interests we find that the 6 a.m.-to-midnight ban is not narrowly tailored to meet constitutional standards. We address each issue in turn.
 
 
 18
 A. The Government's Interests in the Protection of Children
 
 
 19
 The government's interest in helping parents supervise their children has been repeatedly recognized as sufficiently important to justify restrictions on First Amendment activities. See, e.g., Ginsberg, 390 U.S. at 639, 88 S.Ct. at 1280 (upholding regulation of material that was obscene for minors, but not adults). But where constitutionally protected speech is restricted, the government must demonstrate that the restriction is narrowly tailored to advance the asserted compelling interest. Sable, 492 U.S. at 126-31, 109 S.Ct. at 2836-39; ACT II, 932 F.2d at 1509; ACT I, 852 F.2d at 1343-44. In ACT I this court held that the government could "[c]hannel[ ]" programming in order to "protect unsupervised children" but only so long as it remained "sensitive to the first amendment interests of broadcasters, adults, and parents." 852 F.2d at 1340 & n. 12.
 
 
 20
 The government's asserted interest in protecting children also includes its independent interest in protecting the well-being of vulnerable youth and in shielding them from physical and psychological abuse. The Supreme Court has recognized this interest as compelling. Ferber, 458 U.S. at 756-57, 102 S.Ct. at 3354 ("It is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling." (internal quotes and citation omitted)); Ginsberg, 390 U.S. at 640, 88 S.Ct. at 1281; Prince, 321 U.S. at 165, 64 S.Ct. at 441. Accordingly, the Supreme Court has repeatedly upheld restrictions on First Amendment liberties if sufficiently justified by the need to protect the well-being of minors. See Ferber, 458 U.S. at 757, 102 S.Ct. at 3354. In Pacifica, the Supreme Court specifically held that the government "may ... prohibit[ ] ... making indecent material available to children," based, in part, upon the government's independent interest in the " 'well-being of its youth.' " Pacifica, 438 U.S. at 749, 98 S.Ct. at 3040 (quoting Ginsberg, 390 U.S. at 640, 88 S.Ct. at 1281). The government, therefore, has a compelling interest in restricting the exposure of children to indecent material in the broadcast media.
 
 B. Least Restrictive Means
 
 21
 The government has, however, failed to demonstrate that its 6 a.m.-to-midnight ban on indecent material is the least restrictive means to advance its interests in the protection of children. See Sable, 492 U.S. at 126, 109 S.Ct. at 2836. Upon a thorough examination of the legislative and administrative record,[11] see id. at 129, 109 S.Ct. at 2837 (" 'Deference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake.' " (quoting Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 843, 98 S.Ct. 1535, 1543, 56 L.Ed.2d 1 (1978)), we conclude that the government did not properly weigh viewers' and listeners' First Amendment rights when balancing the competing interests in determining the widest safe harbor period consistent with the protection of children.[12] More broadly, we are at a loss to detect any reasoned analysis supporting the particular safe harbor mandated by Congress.
 
 
 22
 [304 U.S.App.D.C. 134] 1. Parental Supervision
 
 
 23
 To begin with, the particular safe harbor chosen by Congress and the FCC is not satisfactorily explained as an attempt to prohibit the broadcasting of indecent material at times when parental supervision is apt to be least effective. Indeed, one could intuitively assume that as the evening hours wear on, parents would be better situated to keep track of their children's viewing and listening habits. The FCC, on the other hand, argues broadly that " 'parents can effectively supervise their children only by co-viewing or co-listening, or, at a minimum, by remaining actively aware of what their children are watching and listening at all times.' " Respondents' Brief at 30-31 (quoting 1993 Order, 8 F.C.C.R. at 710 p 36). Because "it is not practical for parents to exercise this type of control," 1990 Report, 5 F.C.C.R. at 5305 p 62, the FCC's argument continues, "parents who seek to avoid exposing their children to indecency face a nearly impossible task if such material is broadcast." Respondents' Brief at 26. The Commission's argument appears to assume that, regardless of the time of day or night, parents cannot effectively supervise their children's television or radio habits. Accordingly, the government has not adduced any evidence suggesting that the effectiveness of parental supervision varies by time of day or night, or that the particular safe harbor from midnight to 6 a.m. was crafted to assist parents at specific times when they especially require the government's help to supervise their children. The inevitable logic of the government's line of argument is that indecent material can never be broadcast, or, at most, can be broadcast during times when children are surely asleep; it could as well support a limited 3:00 a.m.-to-3:30 a.m. safe harbor as one from midnight to 6 a.m.
 
 2. Shielding Minors from Indecent Material
 
 24
 Alternatively, the government has justified its safe harbor as an effort to shield all minors regardless of age from exposure to indecent material. The government undoubtedly has a compelling interest in preventing exposure to indecent material of children "both old enough to understand and young enough to be adversely affected" by the indecent material. Pacifica, 438 U.S. at 750 n. 29, 98 S.Ct. at 3041 n. 29. Yet, while the interest in preventing children's exposure to indecent material is compelling, the grounds for restricting a minor's First Amendment rights (here as listener or viewer) fade as the minor matures.
 
 
 25
 The Supreme Court has long recognized that the Constitution does not exist for adults alone. See In re Gault, 387 U.S. 1, 13, 87 S.Ct. 1428, 1436, 18 L.Ed.2d 527 (1967). "In most circumstances, the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." Erznoznik v. City of Jacksonville, 422 U.S. 205, 214, 95 S.Ct. 2268, 2275, 45 L.Ed.2d 125 (1975) (footnote and citations omitted). See Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)[13]; Carey v. Population Servs. Int'l, 431 U.S. 678, 692 n. 14, 97 S.Ct. 2010, 2020 n. 14, 52 L.Ed.2d 675 (1977) (plurality) ("minors are entitled to constitutional protection for freedom of speech" (citing Tinker, 393 U.S. 503, 89 S.Ct. 733)). In Erznoznik, the Supreme Court rejected the government's general interest in protecting minors from films containing nudity. It held that "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." 422 U.S. at 213-14, 95 S.Ct. at 2275. Contrary to the government's contention, Pacifica did not overrule Erznoznik. Pacifica was an emphatically narrow decision upholding an FCC ruling on the basis that it was properly aimed at preventing [304 U.S.App.D.C. 135] children's exposure to indecent material at a time when the FCC defined children as minors under the age of 12.[14] The Court was particularly concerned that "broadcasting is uniquely accessible to children, even those too young to read," Pacifica, 438 U.S. at 749, 98 S.Ct. at 3040 (emphasis added), and strongly implied that the Commission would not regulate material that "would not be likely to command the attention of many children who are both old enough to understand and young enough to be adversely affected" by its content. Id. at 750 n. 29, 98 S.Ct. at 3041 n. 29. Therefore, while Pacifica may have implicitly limited Erznoznik where very young children are involved, we do not read Pacifica as a wholesale dismissal of older minors' First Amendment rights that had been explicitly recognized by the Court in Erznoznik.[15]
 
 
 26
 Nevertheless, as suggested by the Court in Ginsberg (upon which Pacifica specifically relied),[16] children are afforded special treatment under the First Amendment in part because of their " 'immaturity.' " Ginsberg, 390 U.S. at 638 n. 6, 88 S.Ct. at 1280 n. 6 (quoting Thomas I. Emerson, Toward a General Theory of the First Amendment, 72 YALE L.J. 877, 939 (1963)).[17] In short, children may be unable to avoid speech that adults know to be harmful to them. Therefore, "[a] State may permissibly determine that, at least in some precisely delineated areas, a child--like someone in a captive audience--is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees." Erznoznik, 422 U.S. at 214 n. 11, 95 S.Ct. at 2275 n. 11 (quoting Ginsberg, 390 U.S. at 649-50, 88 S.Ct. at 1286 (Stewart, J., concurring)). "In assessing whether a minor has the requisite capacity for individual choice the age of the minor is a significant factor." Id. (citation omitted).[18] While a child's ability to make decisions is presumed to be inferior to an adult's, the capacity for choice does not remain dormant throughout childhood until appearing ex nihilo upon the arrival of a person's 18th birthday. We find, for example, [304 U.S.App.D.C. 136] nowhere "in the Constitution ... the authority to distinguish between a willing 'adult' one month past the ... [legal] age of majority and a willing 'juvenile' one month younger." Miller v. California, 413 U.S. 15, 27, 93 S.Ct. 2607, 2616, 37 L.Ed.2d 419 (1973). Accordingly, we conclude that the confident abrogation of a minor's First Amendment rights by a protective government must proceed by a less rigid line than the legal age of majority.
 
 
 27
 When the government affirmatively acts to suppress constitutionally protected material in order to protect teenagers as well as younger children, it must remain sensitive to the expanding First Amendment interests of maturing minors. At some point, the government's independent interest in shielding children from offensive material no longer outweighs the First Amendment interests of minors in receiving important information. See Erznoznik, 422 U.S. at 213, 95 S.Ct. at 2274 (striking down ban on films containing nudity as not justified by interest in protection of minors, noting, inter alia, that prohibition would extend to films containing depictions of "the nude body of a war victim, or scenes from a culture in which nudity is indigenous"); see also Bolger, 463 U.S. at 74-75 n. 30, 103 S.Ct. at 2884-85 n. 30 (noting that statute prohibiting the unsolicited mailing of contraceptive advertisements "quite clearly denies information to minors, who are entitled to 'a significant measure of First Amendment protection' " (quoting Erznoznik, 422 U.S. at 212, 95 S.Ct. at 2274 and citing Tinker, 393 U.S. 503, 89 S.Ct. 733)); Carey, 431 U.S. at 678, 97 S.Ct. at 2010 (striking down restriction of sale and distribution of contraceptives to minors because it would restrict the ability to "exercise the constitutionally protected right of decision in matters of childbearing," id. at 688-89, 97 S.Ct. at 2018, and striking down ban on advertisements for contraceptives, because they interfere with "substantial individual and societal interests in the free flow of commercial information ... related to activity with which, at least in some respects, the State could not interfere," notwithstanding that the advertisements may be "offensive and embarrassing ... and ... would legitimize sexual activity of young people," id. at 700-01, 97 S.Ct. at 2024 (internal quotes and citations omitted)). Here, the government has not demonstrated that its independent interest in shielding children from indecent broadcasts automatically outweighs the child's own First Amendment rights up to her eighteenth birthday. One would assume that even where "patently offensive" material is involved, a seventeen year old does not generally warrant the same degree of governmental protection that may be appropriate for an eight year old.
 
 
 28
 In addition, even assuming that the government's interest in protecting older minors persistently outweighs the First Amendment interests of the minors themselves, the government's weaker interest in shielding older minors from indecent speech may not suffice to outweigh the adults' First Amendment interests that are sacrificed along the way. Therefore, where First Amendment rights of adults are involved, the government may not be heard to argue globally that "there is a reasonable risk that significant numbers of children ages 17 and under" are in the listening and viewing audience "at all times of the day and night." 1993 Report, 8 F.C.C.R. at 707 p 20.[19] The government must adduce data which permits a more finely tuned trade-off between adults' First Amendment rights and the government's interest in protecting children from indecent material as that interest varies in importance with their age.[20]
 
 
 29
 [304 U.S.App.D.C. 137] 3. First Amendment Rights of Adults
 
 
 30
 More generally, there is no evidence at all in the record that the government tailored its protection of children narrowly to avoid unnecessary infringement on First Amendment rights of adult listeners and viewers. Petitioners point out, as they did in ACT I, that the 6 a.m.-to-midnight ban "stretch[es] to all but the hours most listeners [and viewers--young and old alike--]are asleep," thus reducing the adult population to seeing and hearing only material that is fit for children. ACT I, 852 F.2d at 1335. See id. at 1341 (citing Butler v. Michigan, 352 U.S. 380, 383, 77 S.Ct. 524, 526, 1 L.Ed.2d 412 (1957)). The government brushes aside this practical objection on the ground that adults have access to indecent material from broadcast sources after midnight and, more generally, from alternative sources "such as audio and video tapes, cable television, wireless cable or subscription satellite television services." 1993 Order, 8 F.C.C.R. at 709 p 30 (citing 1990 Report, 5 F.C.C.R. at 5308-09). See generally id. at 709-10, pp 28-34. However, in ACT II, supra, we struck down a 24-hour ban on indecent broadcasting despite the Commission's assertion that adults had ample "non-broadcast alternative[s]" for receiving indecent material. See 1990 Report, 5 F.C.C.R. at 5308 pp 84-88. The availability of alternative sources of information simply does not relieve the government from considering the First Amendment rights of the broadcast audience.[21]
 
 
 31
 Candidly, we can locate no evidence in the record that the government has taken the First Amendment interests of adults into account in advancing its compelling interests in the protection of children. The amendment to the Telecommunications Act was offered on the floor of the Senate and was adopted without committee consideration or floor debate, see 138 CONG.REC. S7308 (daily ed. June 3, 1992), drawing its facts solely from the FCC's 1990 Report, see 138 CONG. REC. S7310 (daily ed. June 2, 1992) (submission by Sen. Helms) (incorporating 1990 Report into legislative record). The 1990 Report, in turn, had been the result of proceedings held in support of the 24-hour ban that had been ordered by Congress. See ACT II, 932 F.2d 1504. Therefore, when Congress relied on the 1990 Report, it relied on a rulemaking record that had been an effort "to compile a record in support of Congress' imposition of a 24-hour ban on the broadcast of indecent material." 1989 NOI, 4 F.C.C.R. at 8361 p 29. The outcome of the FCC's 1993 rulemaking proceedings pursuant to the Telecommunications Act, moreover, was preordained because that rulemaking was limited to updating the Commission's record in the 1990 rulemaking. See 1992 NPRM, 7 [304 U.S.App.D.C. 138] F.C.C.R. at 6465 p 9. As the government frankly admits, the sole operating principle by which Congress determined this particular safe harbor was to find a time when "the risk of children in the broadcast audience would ... be lessened." Respondents' Brief at 7 (quoting 138 CONG.REC. S7308 (daily ed. June 2, 1992) (statement of Sen. Byrd)). See id. at 11 ("[A] more extensive safe harbor would undermine the goals of protecting children because there are significant numbers of children in the audience at other times...."). This exclusive focus on the number of children in the audience indicates that the government wholly failed to balance its child-oriented compelling interests against the countervailing First Amendment rights of adult listeners and viewers.[22] What it should have been aiming at was a time when the risk of child viewing was low and yet adult viewers could exercise a meaningful choice to view the material while still awake.[23]
 
 IV. CONCLUSION
 
 32
 In ACT I, we held that the FCC had not adequately justified its administrative decision to impose a 6 a.m.-to-midnight ban on the broadcasting of "indecent" material. 852 F.2d 1332. Congress subsequently ordered a 24-hour ban on "indecent" material. In ACT II, we held the 24-hour ban unconstitutional and remanded the case to the FCC with the same directions as in ACT I, to redetermine the proper safe harbor after a full and fair hearing. ACT II, 932 F.2d at 1510. Once again Congress intervened, now enacting into law the original FCC-imposed 6 a.m.-to-midnight ban, in order (i) to protect the privacy of every American's home, (ii) to help parents supervise their children's listening and viewing, and (iii) independently to shield minors from "indecent" material. The government has not demonstrated to this court the compelling nature of any interest in suppressing constitutionally protected material in order to protect an abstract privacy of the home at the expense of First Amendment rights of its inhabitants. We do recognize, however, the compelling nature of the government's interest in helping parents supervise their children and in independently protecting the well-being of its youth. "A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies." Prince, 321 U.S. at 168, 64 S.Ct. at 443. Nevertheless, restrictions on First Amendment rights, even when imposed in the best interest of children, must still be narrowly tailored and no more burdensome than necessary to advance the protective goal. The boundaries of the 6 a.m.-to-midnight ban were arrived at solely on the basis of a judgment that fewer children are in the broadcast audience between the hours of midnight and 6 a.m. than at other times. That might even more assuredly have been said for a 1:00 a.m.-to-5:00 a.m. or 3:00 a.m.-to-4:00 a.m. safe harbor; no such one-dimensional analysis takes account of the First Amendment interests of older minors and adult viewers in receiving constitutionally protected material. Our system of government demands more precision when rights protected by the First Amendment are curtailed.
 
 
 33
 [304 U.S.App.D.C. 139] We conclude that the government has not tailored its 6 a.m.-to-midnight ban on constitutionally protected speech narrowly so as to advance the asserted interests without unnecessary abridgment of First Amendment rights. Accordingly we vacate the FCC's 1993 Order, and hold section 16(a) of the Public Telecommunications Act of 1992 unconstitutional.
 
 
 34
 Once again the curtain falls and the FCC finds itself roughly in the same position that it occupied at the close of ACT I. The FCC's 1987 Reconsideration Order was neither vacated by this court in ACT I, nor retracted by the Commission. Thus, the Commission's declared intention to broaden enforcement of Sec. 1464 beyond situations like the mid-day "Filthy Words" scenario approved by the Supreme Court in Pacifica still remains. See Reconsideration Order, 3 F.C.C.R. 930. We held in ACT I that this broader approach to enforcement of Sec. 1464 required the Commission to "[ ]determin[e], after a full and fair hearing, ... the times at which indecent material may be broadcast." ACT I, 852 F.2d at 1344. Relying on repeated congressional intervention, the subsequent record compiled by the FCC in the 1989-90 and 1992-93 rulemaking proceedings did not seek to address our concerns raised in ACT I. As in ACT II, however, we find the intervening statute unconstitutional. Therefore, should the Commission maintain its intention to broaden the enforcement of Sec. 1464, we must, once again, direct the Commission to take up its administrative task to " 'redetermin[e], after a full and fair hearing, ... the times at which indecent material may be broadcast,' [and] to carefully review and address the specific concerns we raised in ACT I: among them, the appropriate definitions of 'children' and 'reasonable risk' [of exposure of children to indecent material] for channeling purposes, the paucity of station- or program-specific audience data expressed as a percentage of the relevant age group population, and the scope of the government's interest in regulating indecent broadcasts." ACT II, 932 F.2d at 1510 (citing ACT I, 852 F.2d at 1341-44).
 
 
 35
 It is so ordered.
 
 
 36
 HARRY T. EDWARDS, Circuit Judge, concurring specially in the reversal:
 
 
 37
 I concur in the judgment to reverse, and I agree with much of what is said in the majority opinion. I write separately, however, to express my views on several matters that I find particularly troubling.
 
 
 38
 Initially, it is worth noting petitioners' renewed challenge to the constitutionality of the generic definition of indecency adopted by the Federal Communications Commission ("FCC" or "Commission"). This court twice has rejected unequivocally the contention that the definition is so vague as to violate the First Amendment. Action for Children's Television v. FCC, 932 F.2d 1504, 1508 (D.C.Cir.1991) ("ACT II"), cert. denied, --- U.S. ----, 112 S.Ct. 1281, 117 L.Ed.2d 507 (1992); Action for Children's Television v. FCC, 852 F.2d 1332, 1338-39 (D.C.Cir.1988) ("ACT I"). In ACT I, we read FCC v. Pacifica Foundation, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), implicitly to hold that the FCC's definition of indecency was not unconstitutionally vague, based on the fact that the Supreme Court both quoted elements of the definition with seeming approval and affirmed the Commission's sanction of a radio broadcast whose content ran afoul of the definition. 852 F.2d at 1338-39. Although in ACT I we invited correction from "Higher Authority" in the event we had misread Pacifica, no such correction has issued. Accordingly, we are precluded by our holdings in ACT I and ACT II from revisiting the question of vagueness.
 
 
 39
 This case requires us to address an issue not posed in ACT I or ACT II. Here, in addition to asserting an interest in facilitating parental supervision of their children, the Government further claims an "independent" interest in shielding children from exposure to indecent programming. In my view, these two interests, at least as the Government seems to define their scope, are irreconcilably in conflict. In ACT I, the Government made clear that its interest in facilitating parental supervision presupposed a significant measure of parental autonomy; that is, the FCC "[did] not propose to act in loco parentis to deny children's access [to indecent programming] contrary to parents' [304 U.S.App.D.C. 140] wishes." ACT I, 852 F.2d at 1343 (emphasis in original). Rather, the Government sought only to assist parents " 'to decide effectively what material of this kind their children will see or hear.' " Id. at 1343-44 (quoting In re Infinity Broadcasting Corp. of Pennsylvania, 64 Rad.Reg.2d (P & F) 211, 215 para. 11 (1987)). Approving this interest, we directed the FCC to "determine what channeling rule will most effectively promote parental--as distinguished from government--control." Id. at 1344.
 
 
 40
 In this case, however, the Government appears to take the position that its "independent" interest in protecting children's well-being operates without regard either to parental wishes or to the availability of parental supervision.* This being so, it is hard to comprehend how the Government's "independent" interest does not render superfluous its supposed interest in facilitating parental supervision, even though the FCC explicitly reaffirms the latter. At oral argument, when pressed, the FCC's counsel was unable to explain how these two interests mesh. The FCC's failure to reconcile the interests on which it purports to rely is but one glaring example of the agency's failure to justify the instant regulation.
 
 
 41
 I do not mean to say, however, that I doubt that the Government may have a compelling interest in the well-being of children or that there are many situations, in the First Amendment context and otherwise, in which that interest amply will support Government intervention of various sorts. For example, one sees daily illustrations of such intervention in the family divisions of state courts. In the family court context, however, Government regulation contrary to parental preferences and authority generally is a response to significant breakdowns within the family unit or to the complete absence of parental caretaking. Society protects children who are abused, neglected or abandoned, because the harm suffered is easily proven and no parent has a right to hurt a child in these ways. Indeed, such actions are contrary to the notion of "parenting," so they are not excused when a parent is the culprit.
 
 
 42
 The instant regulation, however, applies far more broadly and is not premised on such discernible harms. Rather, it seems to rest on vague notions that too many parents are either unavailable to supervise their children or inept at the task of parenting, at least insofar as the Government sees it. There are two problems with these views.
 
 
 43
 First, in effectively setting itself up as the final arbiter of what American children may see and hear, the Government tramples heedlessly on parents' rights to rear their children as they see fit and to inculcate in them moral values of the parents' choosing. See Wisconsin v. Yoder, 406 U.S. 205, 211, 92 S.Ct. 1526, 1531, 32 L.Ed.2d 15 (1972) (exempting children of Amish faith from compulsory school attendance on grounds that secondary education teachings "are in marked variance with Amish values and the Amish way of life"); Ginsberg v. New York, 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968) (noting that "parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of society" and of constitutional magnitude). This countervailing interest is not grounded solely in the First Amendment. As at least one scholar has persuasively posited, this parental interest also derives from our constitutional vision of liberty and the role of the individual in a true democracy. "Free people require 'private realms' in which they can develop differently. The child must not be the creature of the state, but must be 'conceived in liberty' and nurtured in contexts sheltered from homogenizing control." Peggy Cooper Davis, Neglected Stories and the Lawfulness of Roe v. Wade, 28 HARV.C.R.-C.L.L.REV. 299, 392-93 (1993) (footnote omitted).
 
 
 44
 [304 U.S.App.D.C. 141] Second, in acting to limit children's exposure to indecent material, the Government's stated purposes rest on inconsistent, confused and possibly false premises. Many persons in society (and I am such a person) suppose that there must be ill effects from exposing children (especially young ones) to "indecent" material; but the truth of the matter is that we have yet to unearth those ill effects with any precision, and we have yet to understand whether the effects are measurably different when parents are available and willing to "supervise" their children. Indeed, "parental supervision" itself is a vague notion, for we surely cannot assume that all parents will act in some uniform way in "supervising" their children. When acting consciously, some parents might prohibit their children from any exposure to indecent material; some might modify a prohibition depending upon the nature of the material and the age of the child; still others might view or listen to indecent material with their children, either to criticize, endorse or remain neutral about what they see or hear (and these responses might vary depending upon the age of the child and family values). Thus, if facilitation of "parental supervision" is the principal interest to be served, then a good argument can be made that ensuring the availability of "blocking" devices--to permit parents to block their children from seeing and hearing indecent material in their absence--is the most that Government ought to do. For the interest of facilitating parental control assumes that parents are entitled to do as they prefer.
 
 
 45
 If, however, the interest to be served is the protection of children, without regard to their parents' preferences, then it seems to me that the issue is quite complicated. A principal problem is that we do not appear to know how the exposure to indecent (as opposed to violent) material affects children, either with respect to their senses of self-worth, their senses of respect for members of the opposite sex, or their behavior patterns as functioning members of society. Thus, to highlight the issue, suppose that we knew for sure that most parents would prefer to retain the right to decide whether and on what terms to allow their children to be exposed to indecent material: could Congress still ban the showing of indecent material? If so, on what terms? Would it be prompted by a "moral judgment " that indecent material is bad for all children of all ages? And, if so, how can that be squared with the Supreme Court's rulings that distinguish between unprotected "obscene" and protected "indecent" materials, and suggest that the ages of minors must be considered in assessing the vulnerability of children? Or, rather, would it be premised on a purpose to save children from harm? If so, what is the nature of the harm, how does it manifest itself, and are children of all ages affected in the same way? Alternatively, would the action be designed to protect society from harm that can come from children who have been exposed to indecent material (or from adults who were exposed when they were minors)? If so, what is the nature of that harm and how pervasive is it?
 
 
 46
 In short, it seems to me that the strength of the Government's interest in shielding children from exposure to indecent programming is tied directly to the magnitude of the harms sought to be prevented. On the record before us, however, I have difficulty discerning precisely what those harms are. In the 1993 Order, the FCC asserts only that "harm to children from exposure to [indecent] material may be presumed as a matter of law" and adverts to the existence of studies demonstrating certain undefined "negative effects of television on young viewers' sexual development and behavior." 8 F.C.C.R. at 706-07 pp 17-18. This does not provide a very secure basis on which to anchor significant First Amendment intrusions. The apparent lack of specific evidence of harms from indecent programming stands in direct contrast, for example, to the evidence of harm caused by violent programming--a genre that, as yet, has gone virtually unregulated. See generally Brandon S. Centerwall, Television and Violence: The Scale of the Problem and Where To Go From Here, 267 JAMA 3059 (1992) (recounting results of several studies demonstrating that prolonged childhood exposure to television violence correlates with increased levels of physical aggressiveness and violence).
 
 
 47
 [304 U.S.App.D.C. 142] In sum, on the record before us, it is quite clear that the Commission has failed in several significant respects to justify the broad restriction at hand. Thus, neither section 16(a) of the Telecommunications Act nor its implementing regulations can be upheld.
 
 
 48
 Finally, I wish to state my understanding of our ultimate resolution of this case. Although we find the 6 a.m.-to-midnight indecency ban unconstitutional, I do not understand the majority to hold the Commission obliged to continue with its efforts to regulate indecent programming. Six years and two statutory interventions after the Commission originally announced its intention to broaden enforcement of 18 U.S.C. Sec. 1464, it is not for this court to assume that the FCC's regulatory agenda has remained static. Moreover, should the Commission choose to go forward, I do not believe it within our authority to order the agency to proceed in any specific administrative fashion, absent some statutory directive. Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 543-44, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978).
 
 
 49
 In ACT I, we ordered the Commission to hold hearings in order to resolve two pending enforcement actions. In this case, however, no enforcement actions are pending. Furthermore, we now readily acknowledge that repeated congressional intervention has prevented the Commission from carrying out its original intention of acting on its own to broaden enforcement of 18 U.S.C. Sec. 1464. I discern no "constitutional constraints or extremely compelling circumstances" that would otherwise empower this court to cabin the Commission's lawful discretion or compel it to act other than as Congress requires. Vermont Yankee, 435 U.S. at 543, 98 S.Ct. at 1211. In other words, there is no legal requirement that the FCC pursue this matter further by "full and fair hearing." Under Vermont Yankee, the Commission is free to proceed by any lawful administrative means it deems appropriate.
 
 
 
 [1]
 Petitioners challenge the constitutionality of section 16(a) of the Public Telecommunications Act of 1992, Pub.L. No. 102-356, Sec. 16(a), 106 Stat. 949, 954, and the FCC's implementing order, In re Enforcement of Prohibitions Against Broadcast Indecency in 18 U.S.C. Sec. 1464, 8 F.C.C.R. 704 (1993)
 
 
 [2]
 Section 1464 provides:
 Whoever utters any obscene, indecent, or profane language by means of radio communication shall be fined not more than $10,000 or imprisoned not more than two years, or both.
 18 U.S.C. Sec. 1464.
 
 
 [3]
 ACT II details the early history of this trilogy of "indecency" cases. We will report only as much as necessary to inform this opinion, adding recent and relevant developments. See ACT II, 932 F.2d at 1506-07
 
 
 [4]
 The order upheld, on reconsideration, the FCC's prior rulings in In re Infinity Broadcasting Corp. of Pa., 2 F.C.C.R. 2705 (1987); In re Pacifica Found., 2 F.C.C.R. 2698 (1987); In re Regents of the Univ. of Cal., 2 F.C.C.R. 2703 (1987)
 
 
 [5]
 Petitioners contend that this case is "controlled by ACT I and ACT II, which recognize that a 6 a.m.-to-midnight indecency prohibition is unconstitutional." Joint Brief of Petitioners at 17. There is one significant difference between those cases and this one, however. In ACT I we determined that in adopting a 6 a.m.-to-midnight ban on broadcasting indecent material, the FCC as an agency had not adequately justified its change in policy. See, e.g., 852 F.2d at 1342 ("apparent change in policy warrants explanation"). Congress is under no such obligation to justify its change in policy, and is free to alter its delegation to an agency. See, e.g., INS v. Chadha, 462 U.S. 919, 955, 103 S.Ct. 2764, 2786, 77 L.Ed.2d 317 (1983) (Congress is free "legislatively [to] alter[ ] or revoke[ ]" its "delegation of authority" (footnote omitted)). Of course, where the First Amendment is involved, we do not defer entirely to legislative findings, see, e.g., Sable Communications of Cal., Inc. v. FCC, 492 U.S. 115, 129, 109 S.Ct. 2829, 2837, 106 L.Ed.2d 93 (1989), but when examining the constitutionality of a regulation the terms of which are spelled out by Congress and leave no room for agency discretion, we are, in effect, reviewing the underlying statute for conformity with the Constitution rather than reviewing a regulation for conformity with the Administrative Procedure Act, 5 U.S.C. Secs. 551-706. Cf. ACT II, 932 F.2d 1504
 
 
 [6]
 While ACT I acknowledges that Pacifica "identified" an interest in "protecting the adult listener from intrusion, in the form of offensive broadcast materials, into the privacy of the home," it does not endorse its legitimacy. ACT I, 852 F.2d at 1344 n. 20
 
 
 [7]
 The underlying FCC ruling had advanced the protection of unconsenting adult listeners as one purpose of the restriction on indecent material. See Pacifica, 438 U.S. at 731 n. 2, 98 S.Ct. at 3031 n. 2
 
 
 [8]
 Similarly, the government relies too broadly on the Supreme Court's decision in Sable for the proposition that the unique characteristics of the broadcast medium warrant restrictions protecting the privacy of the home that might be impermissible in other contexts. Sable struck down a complete ban on indecent telephone messages, and distinguished Pacifica as an "emphatically narrow holding" that relied not only on "the 'unique' attributes of broadcasting," i.e. its " 'uniquely pervasive,' [nature that] can intrude on the privacy of the home without prior warning as to program content," but also on the fact that it is " 'uniquely accessible to children, even those too young to read.' " Sable, 492 U.S. at 127, 109 S.Ct. at 2837 (quoting Pacifica, 438 U.S. at 748-49, 98 S.Ct. at 3040). Accord Bolger, 463 U.S. at 74, 103 S.Ct. at 2884 (similarly distinguishing mailings from broadcast reception). Sable noted that a person who places a telephone call exercises more control over the message received than does the listener who flips on the radio. 492 U.S. at 128, 109 S.Ct. at 2837. More important, however, Sable ultimately refused to adopt any general privacy rationale in the telephone context. Id
 
 
 [9]
 Recognition of the "captive" nature of the broadcast audience with respect to advertisements does not grant the government carte blanche for the suppression of ideas. For example, Columbia Broadcasting quotes Banzhaf v. FCC, 405 F.2d 1082, 1100-01 (D.C.Cir.1968), cert. denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969), as a case recognizing the captive nature of the broadcast audience with respect to commercials. Columbia Broadcasting, 412 U.S. at 128, 93 S.Ct. at 2099. In Banzhaf, however, this court upheld an FCC ruling that required broadcasters who air cigarette commercials to grant reply time to anti-smoking groups, noting specifically that "not only does the cigarette ruling not repress any information, it serves affirmatively to provide information." Banzhaf, 405 F.2d at 1103. Banzhaf involved no suppression of television commercials due to the captive nature of the audience, but to the contrary only required that supplementary informative material be broadcast
 
 
 [10]
 The Commission similarly undermines its own reliance on Pacifica 's dictum that " '[t]o say that one may avoid further offense by turning off the radio when he hears indecent language is like saying that the remedy for an assault is to run away after the first blow.' " Respondent's Brief at 24 (quoting Pacifica, 438 U.S. at 748-49, 98 S.Ct. at 3040). The Commission tells us it would, for example, permit airing a reading of Ulysses not because it is entirely free of objectionable language, but because " 'we would not expect that the Commission would find such [objectionable] references, dispersed as they would have been throughout the three-hour reading of this work of literature, to be patently offensive.' " Respondent's Brief at 28 (quoting Thomas Byrne, at n. 1 (MM Bur., April 7, 1988))
 This reasoning seems, at the least, inconsistent. A single objectionable reference under the Commission's ruling apparently would not trigger a sanction. Therefore, viewers and listeners cannot expect to be shielded from all offensive material even when enjoying FCC-approved programs. On the other hand, in the absence of any regulation of indecent material on broadcast programs, an adult retains the option of turning to another channel after the first objectionable remark is made, thereby avoiding further intrusion. In so doing, an individual would not have suffered more intrusion than had she listened to a government-approved reading of Ulysses. Cf. Bolger, 463 U.S. at 72, 103 S.Ct. at 2883 (noting that generally, recipients of objectionable mailings can simply avert their eyes to avoid further bombardment, and that government can shield only a captive audience that cannot avoid objectionable speech).
 
 
 [11]
 Congress incorporated the FCC's 1990 Report into the legislative record. See 138 CONG.REC. S7310 (daily ed. June 2, 1992) (submission by Sen. Helms)
 
 
 [12]
 As conceded at oral argument, petitioners do not challenge the FCC's authority to regulate "indecent" material in the broadcast media by creating a safe harbor outside of which indecent material may not be broadcast
 
 
 [13]
 To limit Tinker 's recognition of minors' First Amendment rights to the school context would stand the decision on its head. The Court in Tinker held that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." 393 U.S. at 506, 89 S.Ct. at 736 (emphasis added). Of course this assumes that minors have First Amendment rights outside the school context. Indeed the Court noted as much saying that "[s]tudents in school as well as out of school are 'persons' under our Constitution[, and] ... are possessed of fundamental rights which the State must respect." Id. at 511, 89 S.Ct. at 739
 
 
 [14]
 The FCC contends that Pacifica endorses the government's power to restrict the broadcast of indecent speech to minors regardless of age, and that the government therefore need not consider the First Amendment rights of minors in the context of regulating indecent material in the broadcast media. See Respondents' Brief at 37-38. Pacifica does not reach that broadly. In Pacifica, the Commission's regulation of indecent broadcasting was part of an effort to protect children under the age of 12 from "indecent" material. See ACT I, 852 F.2d at 1340-42 (noting that FCC's brief to the Supreme Court in Pacifica argued that the regulation attempted to minimize the risk of exposing children under the age of 12 to indecent material). In ACT I we specifically directed the FCC to explain "why it takes teens aged 12-17 to be the relevant age group for channeling purposes." 852 F.2d at 1341. The First Amendment rights of teenagers, therefore, were at issue neither in ACT I nor in Pacifica. In addition, while in Sable, the Supreme Court said the protection of children includes "preventing minors from being exposed to indecent" material, it ultimately struck down the ban on indecent telephone messages because it was not narrowly tailored to served that interest. Sable, 492 U.S. at 131, 109 S.Ct. at 2839
 
 
 [15]
 Indeed, the Pacifica Court apparently distinguished Erznoznik on the ground that it involved speech outside the home, where the interests of the offensive speaker sometimes outweigh those of the unwilling listener. Pacifica, 438 U.S. at 749 n. 27, 98 S.Ct. at 3040 n. 27. This difference, of course, does not address the listener's or viewer's First Amendment rights
 
 
 [16]
 See Pacifica, 438 U.S. at 750, 98 S.Ct. at 3041 ("The ease with which children may obtain access to broadcast material, coupled with the concerns recognized in Ginsberg, amply justify special treatment of indecent broadcasting.")
 
 
 [17]
 The Court in Ginsberg upheld a criminal obscenity statute prohibiting the sale "to minors under 17 years of age of material defined to be obscene on the basis of its appeal to them whether or not it would be obscene to adults." 390 U.S. at 631, 88 S.Ct. at 1276. The Court noted that obscenity is not protected by the First Amendment and that the legislation before it "simply adjusts the definition of obscenity [to] ... minors." Id. at 638, 88 S.Ct. at 1279 (citation omitted). The Court had "no occasion in th[at] case to consider the impact of the guarantees of freedom of expression upon the totality of the relationship of the minor and the State." Id. at 636, 88 S.Ct. at 1279 (citing In re Gault, 387 U.S. at 13, 87 S.Ct. at 1436). Also, appellant in that case did not challenge the legislation's target age of 17. See id. at 649 n. 5, 88 S.Ct. at 1286 n. 5 (Stewart, J., concurring)
 
 
 [18]
 Cf. Ginsberg, 390 U.S. at 649 n. 5, 88 S.Ct. at 1286 n. 5 (Stewart, J., concurring) ("The appellant does not challenge New York's power to draw the line at age 17, and I intimate no view upon that question.")
 
 
 [19]
 As concurring Commissioner Dennis noted in the 1987 Reconsideration Order on review in ACT I, certainly this "argument[ ] ... in support of midnight as the critical hour may well be equally true if applied to an earlier [or later] hour." 3 F.C.C.R. 930, 938 (Comm'r Dennis, concurring)
 
 
 [20]
 Indeed some of the data gathered by the FCC do show a considerable difference between viewing habits of younger and older children which, however, is then neglected in the FCC's conclusion as to the constant risk of significant numbers of children in the audience. For example, the 1989 NOI upon which Congress relied, see 138 CONG.REC. at S7309 (statement by Sen. Helms), and upon which the Commission draws, see 1990 Report, 5 F.C.C.R. at 5303 p 51, 1993 Report, 8 F.C.C.R. at 707-08 pp 21-23, discusses television viewing data of four selected markets, noting the "general[ ]" similarity in late evening (until 1:45 a.m.) viewing habits between children ages 12-17 and adults. 1989 NOI, 4 F.C.C.R. at 8362 p 33. At the same time, however, the 1989 NOI noted that "[i]n contrast, the percentage of children (ages 2-11) who are viewing TV is lower than the percentage of teen/adult viewers, and generally drops to 5% or below by approximately 10:30 to 11:00 p.m. without regard to market or time of year." Id. While there is some subsequent evidence that in Chicago and New York 6-8% of young children (ages 2-11) have been recorded on certain dates as watching television after 10:30 p.m., see 138 CONG.REC. S7322 (daily ed. June 2, 1992) (submission by Sen. Helms) (incorporating reply by Salem Communications Corp. to 1990 rulemaking proceeding), 1993 Order, 8 F.C.C.R. at 707 p 22 (citing same), the Commission has not rejected its general conclusion that the percentage of younger children (ages 2-11) who are viewing television--at least outside of Chicago and New York--drops to 5% or below by approximately 10:30-11:00 p.m
 In addition, the government has not supported its regulation of radio broadcasting with any data concerning the listening habits of children under the age of 12. The 1989 NOI, for example, finds that children ages 12-17 have similar radio listening habits to adults and that at times children ages 12-17 listened to the radio in somewhat higher percentages than adults. 1989 NOI, 4 F.C.C.R. at 8361 p 29; 1990 Report, 5 F.C.C.R. at 5302-03 pp 38-49; 1993 Order, 8 F.C.C.R. at 708-09 pp 24-27. The Commission cites no data for children under the age of 12, maintaining that "there [is] little quantitative information about the radio listening habits of children under 12 years of age." 1993 Order, 8 F.C.C.R. at 708 p 25 n. 57. If the 6 a.m.-to-midnight ban is meant to protect children under the age of 12, we are puzzled by the government's regulation for the benefit of a radio audience about which it has no information, and are at a loss to understand "how [the government] uses the 12-17 age group figures to reach conclusions about the younger group." ACT I, 852 F.2d at 1341-42.
 
 
 [21]
 Indeed, the Commission purports not to rely on the existence of alternative sources "as the sole basis" for its decision. 1993 Order, 8 F.C.C.R. at 710 p 34 n. 89
 
 
 [22]
 The government's rationale in arriving at the 6 a.m.-to-midnight ban would equally support the imposition of a 24-hour ban on "indecent" material. The 1993 Order states: "In our 1990 Report ... we examined data that showed that there is a reasonable risk that significant numbers of children ages 17 and under listen to radio and view television at all times of the day and night.... We find that our earlier conclusion remains true." 1993 Order, 8 F.C.C.R. at 707 p 20. In the 1990 Report the Commission had concluded that the 24-hour ban was warranted by the audience data and did not unconstitutionally restrict adults' viewing and listening. 5 F.C.C.R. at 5308 p 86
 
 
 [23]
 Similarly, the decision to grant public broadcasting stations an additional two hours (between 10 p.m. and midnight) during which to broadcast indecent material appears problematic as well. Economic considerations inhibiting broadcasting stations from remaining on the air after midnight would appear to apply to commercial as well as public broadcasters. Moreover, the Commission has not explained why the availability of indecent material on some stations does not defeat its overall purpose of limiting children's exposure to indecent material. While we need not reach the constitutionality of the exception for public broadcasting stations that go off the air before midnight, any such special treatment in the future must be adequately explained
 
 
 *
 Indeed, the FCC concludes that "parents can effectively supervise their children only by co-viewing or co-listening, or, at a minimum, by remaining actively aware of what their children are watching and listening [to] at all times." In re Enforcement of Prohibitions Against Broadcast Indecency in 18 U.S.C. Sec. 1464, 8 F.C.C.R. 704, 710 p 36 (1993) ("1993 Order "), reprinted in J.A. 79, 85. This high threshold virtually insures that the FCC can deem many parents incapable of supervising their children, thereby setting the stage for Government usurpation of the parental role